

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PELICAN EQUITY, LLC,

                        Plaintiff,

       -against-

ROBERT V. BRAZELL, STEPHEN L. NORRIS,
TALOS PARTNERS, LLC, RAMA RAMACHANDRAN,
DARL McBRIDE, and BRYAN CAVE LLP,

                      Defendants.

---

09 Civ.  5927 (NRB)

**FIRST AMENDED
COMPLAINT**

        Pelican Equity, LLC, by its attorneys, Altman & Company P.C., for its first

amended Complaint against defendants Robert V. Brazell, Stephen L. Norris, Talos Partners,

LLC, Rama Ramachandran, Darl McBride and Bryan Cave LLP, alleges as follows:

## NATURE OF THIS ACTION

        1.   This action arises out of the defendants' theft of extremely valuable trade

secrets, breaches of the fiduciary duties owed by business partners and company employees

pursuant to written agreements, misappropriation and unfair competition, violation of the

Computer Fraud and Abuse Act, malpractice by a major international law firm, and fraud and

deceit.  Defendant Robert Brazell, the self described co-chairman and managing partner of non-

party American Institutional Partners LLC ("AIP"), together with defendants Stephen Norris,

Rama Ramachandran, and Darl McBride a/k/a "Skyline Cowboy" (collectively, the "Individual

Defendants"), conspired to, and did, steal the information and documents relating to AIP's

proprietary stock loan product[1] (the "Confidential Business Information") and virtually AIP's entire business from AIP and its founder, Mark Robbins.  Plaintiff Pelican Equity, LLC ("Pelican") owns all right, title and interest in and to the Confidential Business Information and AIP's stock loan business and all rights to sue on the claims asserted in this action, having acquired them by assignment from AIP and Mr. Robbins.

2.     The defendants repeatedly acknowledged the extraordinary commercial value of the Confidential Business Information.  So excited was Brazell in November 2008 about his "partnership" in AIP and the future of AIP's stock loan business that he described his state of mind to Robbins via email in the following colorful terms:

> I came home and [performed a certain sexual act] to the stock agreement.  I humped the Prudential brochure.  I am leaving on our new f**king plane to hire the best f**king banker in NYC and open an office so that we are banking deals by this time next week.  Now do you think I am excited!

In other emails, most written from his rbrazell@aipcapital.com email address, Brazell admitted that Robbins had spent more than four years at AIP developing its stock loan product and that "Equitap [the product he later stole] is an AIP business."  Brazell wrote to a prospective hire that AIP "ha[d] a lot of legal opinion work and millions have been spent on the documentation and process."  He repeatedly told Robbins that they would "write billions of dollars in [stock] loans" and together "become billionaires."

3.     Brazell masterminded the conspiracy.  He and his partner Stephen Norris – in flagrant breach of their fiduciary duties to AIP – formed Talos Partners, LLC ("Talos") with

---

[1]     The AIP stock loan product sometimes bore the trade names "Equitap," "Synthetic Secured Lending" or "Smart Hedge."

the aid and substantial assistance of AIP's lawyers at Bryan Cave for the very purpose of using and exploiting the Confidential Business Information for their own financial gain. While still acting as an AIP officer, Brazell solicited AIP employees to work for his new competing venture. AIP employee Rama did so even while still employed at AIP. Brazell and his accomplices also misused their access to AIP's computers to copy the website that AIP was developing and in turn used it for the website they created to promote Talos. They were so sloppy about the copy job that early iterations of the (stolen) Talos website contained references to AIP.

      4.     It did not take the defendants long to capitalize on their misdeeds. In the spring of 2009 Talos, acting through the Individual Defendants, closed more than $500 million in stock loans and amassed a balance sheet of at least $350 million through use of the Confidential Business Information. In closing those loans they used detailed transaction documents, including but not limited to the form of Master Loan Agreement that AIP's former counsel, Bryan Cave, prepared specifically for AIP.

      5.     Bryan Cave and its attorneys breached their fiduciary duties to AIP and committed malpractice. While representing AIP, and without disclosure to it, Bryan Cave attorneys advised and assisted Brazell in forming Talos and setting up its business at a time when Brazell was still acting as "managing partner" of AIP. Remarkably, after aiding Brazell in his breaches of his fiduciary duties to AIP, Bryan Cave belatedly sought to protect itself from AIP's obvious potential claims against it by asking Mr. Robbins to sign a conflicts waiver and release without informing him of the import of that document. That document, if signed, would have resulted in AIP's consent to defendants' theft of its secrets and its business and would have released the defendants, including Bryan Cave, from claims against them. Robbins refused to

sign that letter but Bryan Cave nevertheless continued to work with Brazell and Talos.  To add insult to intentionally wrought injury, Bryan Cave not only prepared Talos' Certificate of Formation but charged AIP for it and was paid for that work by Pelican.

6.      Finally, in a despicable effort to obliterate AIP's business and eliminate any competition from it, the Individual Defendants, and particularly Messrs. Brazell and McBride, littered the Internet with scurrilous postings on www.skylinecowboy.com, a website they used primarily for that purpose, and on Yahoo, Twitter and other message boards.

## PARTIES

7.      Plaintiff Pelican Equity, LLC is a limited liability company formed and existing pursuant to the laws of the State of Delaware with its principal place of business in the State of California. By virtue of a written assignment, Pelican owns (a) all of the intellectual property, business plans, models and other information in and pertaining to the former AIP stock lending business, including but not limited to the "Confidential Business Information" (as that term is defined below) and (b) all rights and claims against Talos, its principals, Bryan Cave, and others for theft or misappropriation (or similar or related claims) of business plans, models and information, and other unlawful conduct.

8.      Robert V. Brazell ("Brazell") is, on information and belief, an individual residing in New York, New York.  Mr. Brazell, who was the founder and former president and CEO of Overstock.com, is the chairman and managing partner of Talos.  From approximately November 2008 through January 2009, Brazell was an AIP officer and held himself out as its "partner" and "co-chairman."

9.      Stephen L. Norris ("Norris") is, on information and belief, an individual

4

residing in the District of Columbia and/or the State of Florida.  He is a member of Talos' board

of managers and its investment committee.  Prior to his involvement with AIP and Talos, Norris

was a founder of The Carlyle Group.  From early 2007 through late January 2009, Norris was a

partner in other ventures with AIP principal Mark Robbins.  Beginning in late 2008, Norris was a

consultant to AIP and a member of AIP's investment committee.

        10.     Talos Partners, LLC ("Talos") is, on information and belief, a Delaware

limited liability company which maintains its principal place of business in the State, City and

County of New York.  Bryan Cave formed Talos in January 2009 at the behest of Brazell and

Norris.  Talos' principal business is the stock lending business it stole from AIP.  On information

and belief, Talos transacts substantial business in the State of New York and in this District.

        11.     Rama Ramachandran ("Rama") is, on information and belief, an

individual residing in San Francisco, California.  He was until January 2009 an AIP employee

but is now senior vice president, research & analytics of Talos.

        12.     Darl McBride ("McBride") is, on information and belief, an individual

residing in Salt Lake City, Utah.  From 2007 through early 2009, McBride sought to become a

partner with Robbins in AIP and to participate in its stock loan business.

        13.     Bryan Cave LLP is, on information and belief, a limited liability

partnership engaged in the practice of law which maintains a large office in the State, City and

County of New York.  It transacts substantial business in the State of New York and in this

District.  The wrongs it committed, which are described in this Complaint, were performed

principally by Bryan Cave attorneys Bartley F. Fisher and Alan S. Pearce in the State of New

York and in this District.

## JURISDICTION AND VENUE

14.  This Court has jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 because Pelican's claim pursuant to the Computer Fraud and Abuse Act ("CFAA") arises under the laws of the United States.  It has supplemental jurisdiction over Pelican's state law claims pursuant to 28 U.S.C. § 1367(a).

15.   This Court has personal jurisdiction over the Individual Defendants because most of them were and are employed by Talos in New York, New York and the others of them participated and are participating in a conspiracy centered here.  Most of the Individual Defendants performed their job responsibilities and committed many of the illicit acts hereinafter described within the State of New York with both the knowledge and intention that such acts would cause injury within the Southern District of New York.  The others engaged in a conspiracy with them with full knowledge of the acts and results that would occur in New York. This Court has personal jurisdiction over Talos and Bryan Cave because they transact business, and the wrongs they committed were performed and caused injury, in New York.

16.   Venue is proper in New York County pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred with the Southern District of New York.

## FACTS

### AIP's Proprietary Stock Loan Business

17.   During the period 2004 through early 2009, AIP developed a novel and potentially immensely profitable program through which it would arrange for persons who own marketable securities to pledge them as security for loans in amounts constituting substantial

percentages of their market value under circumstances in which they could not obtain financing in comparable amounts from traditional lenders.  Under AIP's stock loan program, borrowers would have the benefit of unique and innovative insurance coverage.  AIP's development of that program required the work of financial industry professionals and attorneys over a period of years, the expenditure of millions of dollars in professional fees, the development and nurturing of relationships with substantial insurers and banking firms, and the creation of detailed models and methodologies.

18.     From 2005 to 2008, AIP made numerous loans using evolving versions of its stock loan program.  The AIP stock loan program met a need among potential borrowers that became particularly intense after the credit markets radically tightened in early 2008.  As the defendants recognized, the program's promise was astounding.  Because the pent-up demand that it met was so great, it could lead to the generation of literally billions of dollars in profits for AIP.

19.  The AIP stock loan program, the structure of the transactions effected in it, the model contracts and other documents created for it, the substance of the discussions and agreements in principle with insurers and financial institutions, the names of the institutions and persons in them with which AIP conducted those discussions, and the models and methodologies relating to the AIP stock loan program constituted trade secrets.  Those materials individually and collectively constituted AIP "Confidential Business Information."  AIP maintained the secrecy of its Confidential Business Information by, among other things, limiting detailed knowledge of it to its principals and to others who were involved in that aspect of AIP's business and agreed to keep it confidential.

7

## McBride's Involvement With AIP in 2007-08

20.     Beginning in 2007, McBride expressed an interest in joining AIP. In or about May 2007 he participated in several meetings in New York City with Robbins, Norris, and others in which he discussed his possible participation in AIP and conduct of business ventures with it and its affiliates, including a venture to acquire The SCO Group, Inc. and his participation in AIP's stock lending business. In or about the fall of 2007, at a time when he was president of The SCO Group, Inc., he moved into AIP's Salt Lake City offices and remained there for more than a year. McBride became a trusted confidante of Robbins. While located in those offices, he worked with and supervised AIP sales people and other employees who conducted AIP's stock loan business. He also headed AIP's efforts to resolve problems that arose with an AIP affiliate's development of a resort in Little Exuma, Bahamas. When an AIP comptroller departed, McBride assumed responsibilities regarding AIP's finances. While working there in 2008, McBride repeatedly expressed his desire to become an AIP equity owner and its chief executive officer and in that capacity to oversee its operations. In connection with his work for, and negotiations with, AIP, McBride had access to virtually all of AIP's files and learned the details of AIP's stock lending business that constituted its Confidential Business Information, which he agreed to keep confidential.

## Bryan Cave Performs Legal Work for AIP

21.     Beginning in the Spring of 2008, Bryan Cave worked on the stock loan program for AIP. AIP retained Bryan Cave upon the recommendation of Steven Norris, who said he had enjoyed a twenty year relationship with it through Bryan Cave partner Bart Fisher. That firm agreed to provide its services to AIP pursuant to a written engagement agreement dated

April 30, 2008. In that agreement, Bryan Cave acknowledged that it was creating an "attorney-client relationship" with AIP and that the relationship was to be "one of mutual trust and confidence." Bryan Cave's engagement agreement specifically provided that AIP's consent to conflicting representation would be required "where as a result of our representation of you we have obtained sensitive, proprietary or other confidential information of a non-public nature that, if known to such other client of ours, could be used in any such other matter by such client to the disadvantage of [AIP]."

22.     As a consequence of its engagement, Bryan Cave came to possess confidences and secrets of AIP and AIP Confidential Business Information. Lawyers at Bryan Cave, and most prominently its partners Bartley Fisher and Alan Pearce, assisted AIP in structuring the stock loan program, consulted with AIP's principals regarding regulatory considerations affecting it, and drafted documents necessary to implement the program, including a Master Loan Agreement specifically devised for AIP for use in its stock loan business. Through their work for AIP, attorneys from that firm became privy to virtually every aspect of the Confidential Business Information, including the structure of the program, the contracts and other documents necessary to effect it, and the financial institutions that were and might become involved in it.

**Brazell Becomes an AIP Principal**

23.     In early November 2008, Robbins met Brazell for lunch in Salt Lake City, Utah, at Brazell's request. During that meeting Brazell asked Robbins about AIP's stock loan business. Brazell was familiar with the business as Robbins had facilitated a stock loan transaction for Brazell several years earlier. Brazell told Robbins that he was looking for a new

business opportunity as he was no longer working at Overstock.com.  He said he was very

interested in AIP's stock loan business and convinced Robbins that he could contribute greatly to

it.  Brazell and Robbins followed up that meeting with additional discussions about AIP's

business and Brazell's potential involvement in it.  Brazell said he sought to become an AIP

principal.  Robbins was eager to have a man with Brazell's experience, connections and talents

join the company.  At Brazell's request, and based on his promise to keep the materials and

information AIP provided to him strictly confidential, Robbins sent certain documents to Brazell

including but not limited to the Master Loan Agreement, a detailed summary of the AIP stock

loan product, and an overview explaining in detail the process by which AIP structured and sold

its stock loan product.

      24.     On or about November 8, 2008, Brazell told Robbins that he believed that

the AIP stock loan product was "the best opportunity he has seen in his lifetime."  Brazell said

that he "wants to become partners with [Robbins]" and open offices in New York City as soon as

possible.  He implored Robbins to stay in New York for a month to get the partnership going and

asked Robbins to give him extensive due diligence materials on AIP, including but not limited to

its organizational documents.  Rama, who was an AIP employee at the time, sent that

confidential information to Brazell.  Brazell almost immediately started introducing potential

borrowers to AIP, including (1) Sandie Tillotson, the co-founder of Nu Skin Enterprises, for

whom Brazell claimed to act as a financial advisor, and (2) Sheldon Adelson, the founder of the

Las Vegas Sands Corp., with whom Brazell claimed to have a seat on the board of directors of

another company.  Brazell also claimed to be able to introduce AIP to many other very high net

worth and influential people with whom he purportedly had significant personal relationships.

25.     In a November 12, 2008 email to Robbins, Brazell stated that their proposed collaboration "could be a billion [dollar] pay day for both of us."  On or about that date, Robbins and Brazell agreed to a 50/50 equity split and agreed that AIP would be the entity through which they would together commercially exploit the AIP stock loan business.  Brazell subsequently asked for and was provided with additional Confidential Business Information.  On November 17, 2008, Brazell asked Robbins for access to the computer files containing the website AIP was developing so changes could be made to it to reflect Brazell's participation.   A little more than 24 hours later, at 12:05 a.m. on November 19, 2008, Brazell sent Robbins the enthusiastic, expletive-laced email message quoted in paragraph 2, above.  In a subsequent email message at 2:25 a.m., Brazell told Robbins that "[w]e will be on the billionaire list by 2110 [sic]."

26.  Also in or about November 2008, Brazell moved into an office at AIP's Salt Lake City headquarters.  There he joined  Robbins, McBride, Rama, and others, all of whom had been working there for months to develop AIP's stock loan business.

27.     Brazell subsequently asked for and was granted permission to take over all of the AIP information technology functions.  Accordingly, Rama gave Brazell passwords for all of AIP's information technology platforms and Brazell began using an AIP electronic mail account.  By November 23, 2008, Brazell had committed in an email message to Robbins to contribute assets he (falsely) claimed to be worth approximately $500 million in exchange for his equity share in AIP.  Contracts confirming that agreement were drafted and were executed by Robbins and Brazell.

28.     Brazell's purported $500 million in assets to be contributed to AIP was to

include Brazell's stake in InStore Broadcasting Network ("IBN"), of which Brazell was a

principal.  In or about November 2008, Brazell suggested to Robbins that AIP use the anticipated

profits from its stock loan business by capitalizing on Brazell's personal "insider" knowledge of

IBN to acquire additional ownership in IBN and aggressively dilute the other existing IBN

shareholders.  Brazell also told Robbins that AIP should capitalize on Brazell's personal

"insider" knowledge of another company, MD Enterprises, owned by his close "friend" Von

Whitby, to "steal" that business from its owners.

**Norris Joins AIP and Brazell Sets up Shop in New York**

       29.     In late November 2008, Robbins arranged a meeting for Brazell with

Stephen Norris, who was another trusted confidante of Robbins.  Robbins had done business

with Norris since 2006.  Norris was a party, through his company, in a joint venture with

Robbins that was pursuing, with McBride, in order to take control of The SCO Group, Inc.[2]

Norris had a consulting agreement with AIP, was performing work on AIP's stock loan program,

and was assisting an AIP subsidiary with issues relating to a resort in the Bahamas.  Norris told

Robbins that he too wanted to participate in AIP's stock loan business and was eager to work

with him and Brazell.  By November 25, 2008, Norris was working full time with Brazell, Rama,

---

     [2]     McBride met Norris while he was working for AIP. The conclusion of the venture to take control of SCO Group bore similarities to that of the stock loan business: Norris, McBride, and Brazell took the opportunity for themselves to the exclusion of Robbins.  After Norris and Robbins established a joint venture to purchase SCO out of bankruptcy with McBride's assistance, Norris and Brazell excluded Robbins' company from that entity and replaced it with Brazell's company, Gulf Capital Partners, LLC.  Not coincidentally, Bryan Cave also represented Gulf Capital Partners.  In connection with that endeavor, McBride unlawfully made a $100,000 payment to Norris, which he obtained through a home equity loan that he bragged was fraudulent, to make up for fees that the bankruptcy judge had forbidden SCO to pay Norris.

and others at AIP deploying AIP's stock loan product.  By November 27, 2008, Brazell had sent

out email messages to AIP's email provider identifying himself as co-chairman and managing

director of AIP and Norris was identified as a member of AIP's Board of Directors.  Brazell

requested that business cards be printed for him and Norris with those titles.[3]  The business cards

were to include AIP's address at 540 Madison Avenue, where AIP's stock lending business was

to be located.

        30.     In November 2008, Brazell also told Robbins that he had identified office

space in New York for AIP and began negotiating the terms of a lease for it.  Ultimately Brazell

secured space on the 37th floor at 540 Madison Avenue in New York City, using AIP's Salt Lake

City-based counsel to negotiate the lease.  Brazell also started interviewing and hiring staff.  In

an email message dated November 27, 2008 to a prospective AIP hire, Brazell explained the need

for non-compete language in that person's employment agreement in the following terms:

> By now you understand the unique differences in our product and
> business practices.  The issue here will be simply to preclude AIP
> employees from leaving and duplicating our business or to advise
> others in doing the same.

        31.     In December 2008, Brazell, purportedly acting for AIP, moved into the

offices at 540 Madison Avenue.  In another email message that Brazell sent to a prospective hire

on or about December 13, 2008, a draft of which he sent to Robbins, he stated:

> I have been interviewing someone to be our president of our lending business.
> Equitap is an AIP business. * * * I have not found the right person thus far.
> Initially, the key work is to take loans as they come in from board members and
> brokers; put them through our analytics process, generate a term sheet, walk the
> other attorneys and accountants through the deal, get loan docs out, then process

---

     [3]     Written agreements confirming Norris' participation in AIP were negotiated and
prepared in final though never signed.

the transaction. * * *

We have a renown board including Steve Norris the Founder of Carlyle Group.
Steve is full time with AIP.

Mark [Robbins] and I are the only two equity holders.

32.     Brazell and Norris continued to work full time with AIP through the end

of that month.  They traveled extensively to New York City, Los Angeles, and Salt Lake City to

work on the stock loan program.  On December 28, 2008, Brazell sent Robbins a text message

stating that Norris is "very focused on AON and hitting the loan business hard."  Brazell

followed that text message with an email to Robbins in which he laid out AON's requirements

for agreeing to an "insurance wrap" for AIP's stock loan product and stated that they will "dust

off" the AIP stock lending model (developed with AON and specifically Peter Densen's

assistance) which "[w]e own."

33.     On December 29, 2008, Brazell asked Rama to prepare a "new term sheet"

for prospective AIP client Sheldon Adelson, who was introduced as a one of the world's richest

men and a likely customer for AIP's stock lending program.  He specifically instructed Rama to

"add the AIP logo somehow to the term sheet or put Equitap an AIP company" on it and to "use

the NYC address."  Brazell reported to Robbins that Adelson was very interested in the stock

loan program.  In an email dated January 7, 2009, Brazell told Robbins:

> We are killing it.  I have never worked this hard.  We will have the
> plan and process fully functional by next week. * * *  We will
> write $1B in loans in our first wave of marketing.  This is all I am
> focused on.  This is all that matters.  You will see it when you are
> here.

On January 9, 2009, Brazell reported to Robbins that "[w]e have worked out all the bugs,

14

problems, sales challenges, legal impediments, operational elements, and marketing needs."

34.     Robbins continued during December 2008 and January 2009 to devote his full-time attention and efforts to the development and promotion of AIP's stock loan business. He essentially lived on the road, traveling for weeks without returning to his home in Utah, in order to advance the development and promotion of AIP's stock loan business in New York and other major financial centers.  Then-AIP associate A.J. Discala described Robbins' meeting with Dave Russell, a representative of Ted Wait, the founder of Gateway Computers, in a January 16, 2009 email to Brazell and others as follows:

> Guys just out of the meeting and I have to tell you mark kicked f***ing ass.  Sat toe to toe with a guy with a 3.5 billion dollar balance sheet hit it off like they were college roomies and it may have been the best meeting I've been a part of.  With what just occurred we can be where we hoped wed be in 18 months within 60 days.  It truly was awesome!!!  I truly think if mark gets ted info and references he asked for I believe we can have ourselves a done deal within 2 weeks.  Let's all focus and continue what mark did today and knock the ball out of the park.

35.     Though Brazell and Norris were continuing to work full-time at AIP and although Brazell had agreed to contribute assets to AIP worth approximately $500 million for his equity share, both Brazell and Norris refused to contribute any money or property to fund AIP's operations and the development and promotion of AIP's stock loan business.  Robbins thus continued to shoulder that entire financial burden as he had done for years.

36.     Bryan Cave hosted at its New York offices many of the meetings that Brazell, Norris, and others conducted in December 2008 and January 2009 with AON, UBS, and other businesses with which AIP was negotiating arrangements for its stock lending business. Bryan Cave provided office space for the use of Brazell and his confederates to use while in New

15

York until they established Talos' offices in the same office space at 540 Madison Avenue that Brazell had negotiated to lease on behalf of AIP. The defendants used the Bryan Cave office space until establishment of the Madison Avenue office.

**The World Changes: The Defendants Form Talos and Steal AIP's Stock Loan Business**

37.    In December 2008 or early January 2009, Brazell and Norris agreed to steal AIP's business, destroy AIP, and move forward with its stock loan product but without AIP's founder and principal, Robbins. In that same time period McBride and Rama agreed to join them in that endeavor. To effect that plan the Individual Defendants, among other things, stole Confidential Business Information from AIP's computer system and caused AIP's computer and email systems to be sabotaged and its service interrupted. Acting at Brazell's request and under his direction, Brazell's brother Steve on information and belief intentionally caused AIP's website and electronic mail server to crash and destroyed evidence of his wrongdoing. As a result, AIP's email service was interrupted for an extended period of time and many electronic mail messages were lost. Brazell also enlisted Rama in the defendants' scheme. Rama knowingly participated in the conspiracy by, among other things, securing website addresses and performing trademark searches for the new business.

38.    Brazell also told Bryan Cave partner Bart Fisher, and on information and belief also Alan Pearce, that he and his confederates were moving forward with a new, separate business to exploit the stock loan program. Fisher and others at Bryan Cave assisted the conspirators with that effort. On Brazell's instructions, Bryan Cave formed a new Delaware limited liability company named Talos Partners, LLC. Brazell told Fisher in a January 19, 2009 electronic mail message that Norris and he would be managers of Talos and Norris would be co-

16

chairman.  In that message, Brazell told Fisher: "Please let me know what I need to do to facilitate this.  I don't know how long Mark [Robbins] will remain friendly."

39.     The Bryan Cave attorneys knew that the structure and other details of the stock loan business constituted Confidential Business Information and also knew that Brazell and his co-conspirators were misappropriating that information in their own virtually identical competing stock loan business.   Yet Bryan Cave not only formed Talos but also prepared agreements for it at Brazell's direction.  It, for example, prepared employment agreements between Talos and individuals (such as Rama) who were either existing employees of AIP and/or persons whom AIP had recruited for positions in its stock loan business.  On information and belief its attorneys also revised the stock loan agreements they had drafted for AIP to delete references to AIP and replace them with references to Talos.

40.     Bryan Cave's Fisher and his partner, Alan Pearce, concealed the defendants' breaches of trust from Robbins and AIP.  They did not disclose the defendants' preparations to steal AIP's secrets and form a competing business, their actual theft of those secrets, their formation of that business through Bryan Cave, and Bryan Cave's work for that business after its formation.  Rather, they actively assisted the defendants with their misconduct by performing legal services for them.  However, in late January 2009, Fisher apparently came to understand that the illicit activities of Brazell and his confederates, and also his own assistance of their misconduct, would not be hidden from AIP and Robbins forever.  He therefore belatedly prepared an astonishing conflict-of-interest waiver for Robbins' signature and sent it to Robbins.  That document (the "Waiver Letter") read:

As you are aware, American Institutional Partners, LLC ("AIP"),

17

Mark Robbins and various entities related to AIP and Mr. Robbins (collectively, the "AIP Parties") have been engaged in various business activities related to the formation and operation of a lending business. Bryan Cave LLP has represented the AIP Parties in connection with such business activities.

We understand that Robert V. Brazell intends to pursue such business activities and we hereby consent to Mr. Brazell and any entities formed by him (the "RB Parties") pursuing such business activities and we hereby agree that we shall have no claim against the RB Parties for pursuing such business activities or against Bryan Cave LLP for advising and assisting the RB Parties in that endeavor. Moreover, we also consent to the RB Parties using the work product of Bryan Cave LLP resulting from its representation of the AIP Parties. Finally, we consent to Bryan Cave LLP representing the RB Parties in connection with the previously referred to business activities, to Bryan Cave's disclosure to the RB Parties of any of the AIP Parties' confidences or secrets, and to Bryan Cave LLP's use of the aforementioned work product therewith. In providing this consent, we have sought and received the advice of counsel.

That letter shocked Robbins. He of course never signed it.

41.    Bryan Cave did not advise or seek to advise Robbins and AIP concerning their potential claims against Brazell and his "entities" arising out of their theft of AIP's stock loan business. It did not explain the consequences of the release it sought on behalf of Brazell, his companies, and Bryan Cave itself. Nor did Bryan Cave address with Robbins and AIP the importance of securing independent legal advice concerning those matters.

42.    Notwithstanding the refusal by AIP and Robbins to sign Bryan Cave's Waiver Letter, Bryan Cave lawyers Fisher and Pearce and, on information and belief other attorneys at the firm, represented Brazell, Talos, and other entities the Individual Defendants formed to compete against AIP. On information and belief Bryan Cave lawyers formed other entities, in addition to Talos, through which the defendants operated their competing business.

18

That firm performed legal work for Talos, its principals, and on information and belief other affiliated entities in connection with the stock loan business after, and on information and belief also before, it ceased its representation of AIP.  Among other things, Bryan Cave used documents that its attorneys had drafted for AIP, including loan agreements, as models for Talos transactions, which documents, as they well knew, also constituted Confidential Business Information.  Indeed, Bryan Cave's attorneys could not help but use the confidential information regarding the structure and execution of the stock loan program that they had learned from representation of AIP in their representation of Talos in its virtually identical pirated business. Bryan Cave knew or should have known when it disclosed AIP's confidences and secrets and its work product to Brazell and his entities that the information would be used in commerce to AIP's detriment.

       43.   Bryan Cave's concealment of the defendants' wrongdoing was not limited to its failure to disclose those breaches of trust to its client.  After AIP requested that Bryan Cave provide AIP with its client files, Bryan Cave delivered a file that it represented to be the entire client file.  However, missing from the file were at least 76 documents, including correspondence, exchanges, notes, minutes, and memoranda, that can be gleaned from Bryan Cave's invoices.

**Usurpations; Smear Campaign**

       44.   On information and belief, Talos also appropriated for itself a business opportunity to participate in a real estate venture with Pacific Group, a substantial real estate development and investment company.  In late 2008 and January 2009, Robbins and Brazell discussed with Douglas Anderson, a Pacific Group principal, the formation of a fund.  Anderson

expressed great interest in that collaboration.  Brazell and Robbins met a team that Anderson

assigned to the project at AIP's headquarters and they had several meetings at which they

discussed the terms of their involvement in a real estate fund that Pacific Group would operate.

Brazell continued those discussions with Pacific Group in early 2009 for the benefit of Talos and

on information and belief ultimately formed Talos Pacific Real Estate with that company, thereby

usurping an opportunity that AIP would otherwise have enjoyed.  Bryan Cave represented Talos

in that transaction and invoiced AIP for some of those services.

45.     The defendants also usurped AIP's opportunity to form a business

relationship with AON, a major insurance and financial services company, to participate with

AIP in the stock loan program.  Brazell and Norris represented AIP in negotiations with AON .

In a December 15, 2008 email message to Pamela Newman at AON,[4] Norris wrote: "Mark

[Robbins] has gotten his loan product up and running and we want to discuss.  Also, I have

formed an association with a terrific businessman and I want you to meet him-Rob Brazell."

Two days later, on December 17, 2008, Brazell sent an email to Robbins stating:

> Great meeting with Pam Newman today.
> We are meeting with Peter [Densen] and their team this week,
> She believes they can underwrite all of our re-delivery risk
> immediately.
> If we can get this underwriting, we are done!

46.     In a December 18, 2008 email to Robbins, which contained Brazell's

then-standard signature as "Co-Chairman Managing Partner AIP LLC," Brazell told Robbins

---

[4]     Norris had years before then introduced AON and its senior executive Pamela
Newman to Robbins in connection with AIP's stock loan product.  Robbins worked directly with
Newman, Peter Densen, and other AON personnel from 2006 to 2009 to develop modeling,
analytics and methodologies for AIP.

that:

> We are meeting with the AON team Friday morning at our AIP offices.  We are hoping that we can get an insurance product for our loans.  We [he and Steve Norris] are both encouraged with the potential here.  Our goal is to get a pricing matrix from them that allows us to bundle loans or do individual loans.  We plug in the terms and dynamics and we get a price.  If we get this done we will write billions of dollars in loans.

47.     In early January 2009, Brazell and Norris (purportedly on behalf of AIP) negotiated an arrangement with AON regarding the stock loan business.  They informed AON that Norris should be the signatory for AIP.  AON prepared a draft agreement based on those instructions identifying Norris as the signer for AIP, in his purported capacity as "principal" of AIP.  However, on information and belief, Brazell and Norris consummated an arrangement with AON on behalf of Talos on terms substantially similar to those negotiated by Brazell and Norris for AIP in January 2009.

48.     Talos is today conducting business from the same offices at 540 Madison Avenue that Brazell previously purported to secure for AIP.  Talos hired or engaged numerous individuals who previously were AIP employees or whom AIP recruited to work in or consult on the AIP stock loan business, including Peter Densen (formerly of AON and who is currently listed on Talos' website as its Chief Risk Officer and Chairman of its Underwriting Committee), Senator Robert W. Kasten, Brian Nord, Larry Russell Jr., Todd Bergeron, Derek Cornaby, Douglas Anderson and Robert M. Daughtry.  On information and belief, the defendants (other than Bryan Cave) closed or sought to close loans with Sandie Tillotson and Sheldon Adelson, potential AIP clients with whom they had discussed stock loan business while working for AIP.  On information and belief, by mid-2009 Talos had closed more than $500 million in loans using

the stolen Confidential Business Information.

49.     On or before February 11, 2009, the Individual Defendants began a smear campaign against Robbins and AIP.  Brazell made disparaging statements to AIP vendors about Robbins in order to harm his reputation and drive AIP out of business.  McBride, at Brazell's direction, established a website named skylinecowboy.com, the purpose of which was to make disparaging and misleading statements about Robbins and his business and to discredit him.  He and another accomplice, A.J. Discala, also posted negative and false statements about Mr. Robbins and his business on twitter and Yahoo! Finance postings.

50.  Among the false statements that McBride published over the internet were that Robbins had "pled No Contest to fraud," owes more than $40,000,000 to others, and had "become dubbed 'the Bernie Madoff of Utah'" due to "Ponzi-type swindling."  He referred to the stock loan business as the "Robbins stock loan scam."  In some of his postings, McBride urged parties not to do business with Robbins or his associates.  To the extent that many of the postings contained a grain of truth, however distorted or mixed with jaundiced opinion, the defendants had learned of those matters through their association with AIP and access to its records and nonpublic information.  The object of those efforts was to assist in the Individual Defendants' effort to destroy AIP while they started up Talos and competed against it.  Yet they also had more ambitious hopes for it.  Brazell and another working with him stated publicly that: "by the time we get done with Robbins he will commit suicide" and bragged about using "our little 'Bulldog Puppet' McBride to take him [Robbins] down."

51.  Although McBride's internet postings were his most visible contribution to the defendants' conspiracy to destroy Robbins and AIP and steal AIP's business, his participation

in that conspiracy was not limited to those postings.  An experienced executive, he was not involved merely to act as a low-level hatched man for the other conspirators.  Rather, he was and is a full participant in the conspiracy and participated in and consulted regarding the planning of the overall scheme.  On information and belief he shared with the others the Confidential Business Information in his possession and collaborated with the others in the operation of their new pirated business.  The other conspirators, including Brazell, agreed that McBride would participate in Talos and in the profits all of them hoped their venture would reap.

### FIRST CLAIM FOR RELIEF
### Violation of the Computer Fraud and Abuse Act
### (Against the Individual Defendants)

52.     Pelican incorporates by reference the allegations contained in paragraphs 1 through 51 of this Complaint.

53.     The email and computer system developed and used by AIP was at all relevant times used in interstate and foreign commerce and communication, and is thus a "protected computer" under CFAA, 18 U.S.C. § 1030(e)(2).

54.     By engaging in the conduct described herein, the Individual Defendants knowingly and with intent to defraud accessed protected computers and data without authorization or in excess of their authorization, and by means of such conduct furthered the intended fraud and obtained things of value (that is, AIP's website, software and Confidential Business Information) in violation of 18 U.S.C. § 1030(a)(4).

55.     By engaging in the conduct described herein, the Individual Defendants knowingly caused the transmission of a program, information, code or command, and as a result of such conduct, recklessly and intentionally caused damage without authorization, and/or

intentionally accessed a protected computer without authorization, and as a result of such

conduct, caused damage and loss, in violation of 18 U.S.C. §§ 1030(a)(5)(A)-(C).

      56.     The actions of the Individual Defendants have caused Pelican's

predecessor in interest, AIP, to suffer compensable loss in an amount to be determined at trial,

but which in any event exceeds the statutory annual threshold of at least $5,000 in value in the

aggregate, as required by 18 U.S.C. §§ 1030(a)(4) and 1030(c)(4)(A)(i)(I).  Such loss includes

the unauthorized copying, transmittal of Confidential Business Information and other data by the

Individual Defendants from AIP's computer system, and includes more than $5,000 in losses

caused by Internet and email service interruption and/or related repair costs.

**SECOND CLAIM FOR RELIEF**
**Misappropriation of Trade Secrets**
**(Against All Defendants)**

      57.     Pelican incorporates by reference the allegations contained in paragraphs 1

through 56 of this Complaint.

      58.     Pelican and its predecessor in interest, AIP, possess certain confidential

and proprietary business information and trade secrets, including without limitation the

Confidential Business Information, which defendants Brazell, Norris, and Rama, as former

employees and officers and directors of AIP, McBride, as a former consultant, and Bryan Cave,

as AIP's attorneys, were at all relevant times under a common law duty not to disclose or use in

competition with or to the detriment of AIP or its successor in interest, Pelican, and which they

agreed not to disclose or use.

      59.     Each of the defendants has disclosed and used, and is continuing to

disclose and use, such Confidential Business Information and other confidential information

24

about AIP and its contacts and negotiations with other entities, for their benefit and that of Talos, in competition with and to the detriment of Pelican, AIP's successor in interest.  Talos has, through those other defendants, also misappropriated, received, and used that Confidential Business Information and trade secrets.  Talos and the Individual Defendants will continue to disclose and use such Confidential Business Information for their own benefit and the benefit of Talos.

60.     As a result of the actual and inevitable disclosure and use of the Confidential Business Information by defendants Brazell, Norris, Rama, McBride, Bryan Cave, and Talos, AIP and Pelican, as AIP's successor in interest, have been damaged and Pelican continues to be damaged in an amount to be determined at trial but which is on information and belief in excess of $100,000,000, for which the defendants are each jointly and severally liable. They should also be ordered to return all Confidential Business Information to Pelican and should be enjoined from further use of it, as Pelican's legal remedies are inadequate to compensate for the continuing misuse of its confidential and/or proprietary information.

61.     Because defendants Brazell, Norris, Rama, McBride, and Talos committed the wrongful acts described herein willfully, wantonly and maliciously, with reckless and callous disregard for the rights of AIP and Pelican as its successor in interest, and with the intent of crippling Robbins and AIP's business, Pelican is also entitled to punitive damages against each of those defendants in amounts to be determined at trial.

## THIRD CLAIM FOR RELIEF
### Breach of Fiduciary Duties and Duty of Loyalty
### (Against Defendants Brazell, Norris, and Rama)

62.   Pelican incorporates by reference the allegations contained in paragraphs 1 through 61 of this Complaint.

63.   As trusted employees and officers of AIP, defendants Brazell, Norris, and Rama owed AIP fiduciary duties of undivided loyalty, utmost good faith, and complete honesty with respect to all matters affecting or potentially affecting AIP's business affairs.  The duties owed by each of those defendants to AIP existed throughout the terms of their affiliations with AIP and survive their termination.

64.   As a consequence of the conduct described herein, defendants Brazell, Norris, and Rama have breached their duties by, among other things:

(a)   secretly planning and carrying out, individually and in concert with one another, a course of conduct designed to disrupt and destroy AIP's stock loan business by appropriating the Confidential Business Information and AIP's website for their competing venture, Talos;

(b)   on Brazell's part, soliciting the other Individual Defendants to violate their duties to AIP, to work for a competing venture, and to leave AIP's employ;

(c)   taking advantage of and diverting to themselves and to Talos tangible business opportunities and expectancies developed during their affiliations with AIP, which would have come to and profited AIP but for the defendants' wrongful acts;

(d)   misappropriating, disclosing and using, for their own benefit and the benefit of Talos, in competition with and to the detriment of AIP, valuable confidential and proprietary business information, including without limitation the Confidential Business information, that

26

the defendants would not have acquired but for the position of trust and confidence they held within AIP;

(e)  otherwise usurping, misappropriating, and interfering with AIP opportunities, including on information and belief opportunities for stock lending transactions with Sandie Tillottson and Sheldon Adelson, business relationships with Robert Kasten, Brian Nord, Larry Russell Jr., Todd Bergeron, Douglas Anderson, Robert Daughtry, and Derek Cornaby, the lease for office space at 540 Madison Avenue, and the venture with Pacific Group, during and shortly after their affiliations with AIP ;

(f)  using information obtained at AIP as the basis for scurrilous and often false internet postings;

(g)  sabotaging AIP's server and computer; and

(h)  failing to act solely and exclusively in the best interests of AIP while they were employed by and affiliated with AIP in positions of trust and confidence.

65.    As a result of those breaches of duty, AIP lost business and its goodwill and standing in the market was decimated and Pelican, as AIP's successor in interest has also suffered and continues to suffer other damages and injury, including lost profits and profit opportunities in an amount to be determined at trial but which is on information and belief in excess of $100,000,000.

66.    Because defendants Brazell, Norris, McBride, and Rama committed the wrongful acts described herein willfully, wantonly and maliciously, with reckless and callous disregard for the rights of AIP and Pelican as its successor in interest, and with the intend of crippling Robbins and AIP's business, Pelican is also entitled to punitive damages against each

of them in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### Tortious Interference With Fiduciary Duties and Duty of Loyalty
### (Against Brazell and Talos)

67.     Pelican incorporates by reference the allegations contained in paragraphs 1 through 66 of this Complaint.

68.     As described above, defendants Norris and Rama owed AIP fiduciary duties and duties of undivided loyalty.  Bryan Cave also owed AIP fiduciary duties.  Brazell and Talos, with knowledge of Norris's and Rama's relationships with and duties owed to AIP, intentionally induced them to violate those duties and participated with them in their breaches of trust by misappropriating AIP's Confidential Business Information and its website and software, causing a wholesale abandonment of AIP, and otherwise engaging in conduct designed to destroy AIP's business and appropriate it for the defendants' own venture.  They also intentionally induced Bryan Cave to violate its fiduciary duties to AIP by directing its attorneys to perform work for the defendants' competing venture that obviously implicated those duties.

69.     In consequence of Brazell's and Talos' tortious interference with the other defendants' fiduciary duties to AIP, AIP and through it Pelican, its successor in interest, have been damaged in an amount to be determined at trial but which is on information and belief in excess of $100,000,000.

## FIFTH CLAIM FOR RELIEF
### Unfair Competition
### (Against Talos, Brazell, Norris, McBride, and Rama)

70.     Pelican incorporates by reference the allegations in paragraphs 1 through 69 of this Complaint.

28

71.     Since at least sometime in January 2009 the defendants, acting individually and in active concert and cooperation with one another, have competed and continue to actively and directly compete against AIP by unfair and wrongful means that include, among other things:

(a)   planning, participating in, and ultimately executing their plan to steal the Confidential Business Information, set up a competing stock loan business, and destroy AIP and the stock loan business it and Robbins spent years and millions of dollars developing;

(b)   breaching the duties that the Individual Defendants and Bryan Cave owed to AIP and aiding and abetting those breaches;

(c)   misappropriating and wrongfully disclosing and/or using AIP's confidential and proprietary business information, in competition with and to the detriment of Pelican as AIP's successor in interest;

(d)   disparaging Robbins and AIP to AIP's and Talos's customers and prospective customers and the general public; and

(e)   diverting for the benefit of themselves and of Talos tangible business opportunities and expectancies developed during their employment with AIP that they were obligated to pursue and secure for AIP.

72.     As a direct and proximate result thereof, defendants have caused AIP, and through it Pelican, to lose market standing, business and business opportunities, profit and opportunities for profit that it, and therefore Pelican, would have had but for the defendants' wrongful acts and unfair competition. AIP, and through it Pelican, has been damaged in an amount to be determined at trial but which is on information and belief in excess of

29

$100,000,000.  Because the defendants committed the wrongful conduct described herein

willfully, wantonly and maliciously, with reckless and callous disregard for the rights of AIP and

those of Pelican as AIP's successor in interest, and with the intent of crippling AIP, Pelican is

also entitled to punitive damages against them.

### SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Breach of Fiduciary Duty, Duty of
### Loyalty, Misappropriation, and Unfair Competition
### (Against Bryan Cave)

73.     Pelican incorporates by reference the allegations contained in paragraphs

1 through 72 of this Complaint.

74.     Defendants Brazell, Norris, and Rama owed AIP fiduciary duties and the

duty of loyalty.  Bryan Cave knew of the relationships of Messrs. Brazell, Norris, and Rama with

AIP and knew they owed those duties to that company.  Bryan Cave also came to know that

Messrs. Brazell, Norris, and Rama were breaching their duties to AIP, were misappropriating its

trade secrets, preparing to compete unfairly with it, and then that they were competing unfairly

with it.  Nonetheless, Bryan Cave substantially assisted those individual defendants in

committing their misconduct by, inter alia, forming their competing business and helping them to

misappropriate AIP's Confidential Business Information, to compete with AIP while still

employed as officers and employees there, and effectively to destroy AIP's business.  Indeed,

Bryan Cave itself participated in the misappropriation of AIP's confidential information and used

it for the benefit of AIP and its principals.

75.     . As a result of Bryan Cave's aiding and abetting the others' breaches of

their duties of loyalty and of their fiduciary duties and their unfair competition, AIP lost business

30

and its goodwill and its standing in the market was decimated and Pelican, as AIP's successor in interest, has also suffered and continues to suffer other damages and injury in an amount to be determined at trial but which is on information and belief in excess of $100,000,000.

## SEVENTH CLAIM FOR RELIEF
### Tortious Interference with Prospective Business Relations
### (Against Talos, Brazell, Norris, McBride, and Rama)

76.     Pelican incorporates by reference the allegations contained in paragraphs 1 through 75 of this Complaint.

77.     AIP had prospective business relations with various entities, including AON and Pacific Group, with which defendants have intentionally interfered. As described herein, defendants have used wrongful, dishonest, unfair and improper means to interfere with AIP's prospective business relations. As a direct and proximate result of defendants' use of wrongful, dishonest, unfair and improper means, Pelican has been and will continue to be injured in an amount to be determined at trial but which is on information and belief in excess of $100,000,000.

78.     Because, in tortiously interfering with AIP's prospective business relationships, the defendants acted intentionally and deliberately, and with willful and wanton disregard for AIP's rights, plaintiff is entitled to punitive damages against defendants.

## EIGHTH CLAIM FOR RELIEF
### Conspiracy to Compete Unfairly, Tortiously Interfere With Business
### Relations, and Breach Fiduciary Duties and Duty of Loyalty)
### (Against Brazell, Norris, McBride, and Rama)

79.     Pelican incorporates by reference the allegations contained in paragraphs 1 through 78 of this Complaint.

31

80.   Defendants Brazell, Norris, McBride, and Rama agreed to establish a business to compete with AIP while they were still affiliated with that company and in violation of their duties to it, to compete with AIP through use of its Confidential Business Information, and to destroy AIP's business.  They in fact did steal AIP's confidential information, used it to establish their competing business, usurped its opportunities, engaged in a smear campaign against AIP and its principal officer, and thereby did effectively destroy AIP's business as they intended.  At the most critical stages of the conspiracy, from its inception in December 2008 and January 2009, its leader, Brazell, was located primarily in New York and operated primarily from Bryan Cave's New York offices and from the offices at 540 Madison Avenue.  As known to all of the conspirators, a substantial portion of the defendants' wrongful acts occurred there, including their use of AIP's attorneys and obtaining of confidential AIP information from them, some of their thefts of information from AIP, the establishment of their competing business, and most of their competition with AIP through operation of that business.  Each of the conspirators was aware of those main elements of the conspiracy, including the acts committed in New York, and each hoped to benefit from the conspiracy through participation in the revenues the competing business would generate, as on information and belief they agreed among themselves.

81.   AIP, and through it Pelican, was damaged by that conspiracy and by the acts committed in furtherance of it, in amounts to be determined at trial but which are believed to total in excess of $100,000,000, for which defendants Brazell, Norris, Rama, and McBride are jointly and severally liable.

32

### NINTH CLAIM FOR RELIEF
### Malpractice/Breach of Fiduciary Duties
### (Against Bryan Cave)

82.     Pelican incorporates by reference the allegations contained in paragraphs 1 through 81 of this Complaint.

83.     As AIP's attorneys, Bryan Cave and its members Bartley Fisher and Alan Pearce owed AIP fiduciary duties of due care and undivided loyalty in performing their work as attorneys for AIP.  Bryan Cave breached those duties by, among other things, (a) failing to inform AIP promptly when it learned that Brazell and/or his accomplices were preparing to compete with AIP while acting as AIP principals and/or employees and owed fiduciary duties to AIP, (b) actively providing legal counsel to Brazell and Talos, (c) assisting Brazell in the formation and establishment of a competing business, Talos, without previously obtaining an informed waiver of their conflict of interests from AIP, (d) working for Brazell and the competing venture both before and after his and his confederates' departures from AIP while Bryan Cave possessed AIP's Confidential Business Information and information regarding its development and use, and even billing AIP for work they performed for Brazell and Talos, (e) providing Brazell with confidential AIP information and work product and disclosing it to, and using it for, Brazell and Talos, and (f) seeking a release from AIP and Robbins on behalf of Brazell and Talos of all claims against them without adequately informing them of the import of that release or of the position in which they had put themselves.  On information and belief Bryan Cave actually consciously considered and used Confidential Business Information that they had learned from and created for AIP in their representation of those defendants.

84.     Bryan Cave violated numerous ethical rules in so doing.  They violated

New York State Disciplinary Rule DR 1-102(A)(1),(4) and (7). Particularly, Bryan Cave among

other ethical breaches violated Disciplinary Rule 4-101(B) by revealing AIP client confidences

and secrets, using those confidences and secrets to the disadvantage of AIP, and to the advantage

of third parties (the other named defendants) without AIP's consent and without full disclosure to

it. Bryan Cave also violated Disciplinary Rule 5-105(A) and (B) and DR 5-108(A) by

simultaneously representing AIP and defendants Brazell, Norris and Talos in substantially related

matters in circumstances in which their interests were adverse. Bryan Cave further violated

Disciplinary Rule 7-102(A)(3) and (7) by concealing, knowingly failing to disclose and assisting

the other defendants in their fraudulent conduct. Bryan Cave indeed violated Disciplinary Rule

7-102(B) by not calling on the defendants to rectify their fraud and, failing that action, reporting

that misconduct to Robbins and AIP. Bryan Cave violated Disciplinary Rule 9-102 by

misappropriating AIP's Confidential Business Information for themselves and also for the benefit

of the other defendants.

      85.     Bryan Cave's foregoing breaches of its duties damaged AIP and through it

Pelican. Bryan Cave's failures to inform AIP promptly of the preparations to compete with AIP

and the conspiracy to steal its secrets prevented AIP from immediately terminating the access of

Brazell and any existing confederates to its computer system and Confidential Business

Information, preventing Brazell from enticing other of the Individual Defendants to breach their

duties to AIP and join him in his illicit activities, preventing any others who had at the time

joined him from stealing information and undermining its business, and from taking other

measures to limit the damages it suffered as a result of those activities. The assistance Bryan

Cave provided to Brazell and the other defendants in the commencement and operation of their

competing business, which they were in a uniquely good position to provide due to their access

to and creation (at AIP's expense) of much of the Confidential Business Information, also

allowed the other defendants more effectively to establish and operate their competing business

to AIP's detriment and to destroy AIP's business than they would otherwise have been able to do.

But for Bryan Cave's misconduct, AIP would, on information and belief, have been able to stop,

and would in fact have stopped, the defendants' conspiracy from coming to fruition.

86.     In consequence of that malpractice and breaches of fiduciary duties, AIP,

and through it Pelican, has been damaged in an amount to be determined at trial but which is on

information and belief in excess of $100,000,000, for which Bryan Cave is liable.

### TENTH CLAIM FOR RELIEF
### Fraud and Deceit
### (Against Defendants Brazell, Norris, and Rama)

87.     Pelican incorporates by reference the allegations contained in paragraphs 1

through 86 of this Complaint.

88.     Beginning in or around January 2009, defendants Brazell, Norris, and

Rama concealed their intent to steal the Confidential Business Information and AIP's stock loan

business from Robbins and AIP and to form and operate a competing business.  They pretended

and represented that they were working for AIP's benefit when in fact they were working to

compete with it and destroy its business.   Their concealment operated as a fraud and deceit on

AIP and as a result Pelican.

89.     As a result of the fraud and deceit perpetrated by the defendants, AIP, and

Pelican as its successor in interest, has suffered and continues to suffer damages and injury in an

35

amount to be determined at trial which is on information and belief in excess of $100,000,000.

**WHEREFORE**, plaintiff respectfully requests that this Court issue and order:

A.    Compelling defendants to immediately deliver to Pelican all confidential and proprietary AIP business materials and information in their possession custody or control, including without limitation the Confidential Business Information and enjoining them from further use of those materials;

B.    Imposing a constructive trust in favor of Pelican for all membership interests of defendant Talos Partners, LLC, the proceeds of the Confidential Business Information, and all profits obtained by the defendants as a result of their wrongful conduct;

C.    Awarding Pelican compensatory damages in an amount to be determined at trial but which is on information and belief in excess of $100,000,000;

D.    Awarding Pelican punitive damages in an amount to be determined at trial,

E.    Awarding Pelican its attorneys' fees and the costs and expenses of this litigation; and

F.    Granting Pelican such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Pelican demands a trial by jury on all issues to the fullest extent permitted under applicable law.

New York, New York
September 18, 2009

ALTMAN & COMPANY P.C.

By: _____
        Steven Altman
        Eric P. Rosenberg

260 Madison Avenue, 22nd Floor
New York, New York 10016
(212) 683-7600
SAltman@AltmanCo.net
Eprosen@aol.com

Attorneys for Plaintiff Pelican Equity, LLC

37

## DECLARATION OF SERVICE

Eric Rosenberg, hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

I am an attorney licensed to practice law in the State of New York and am associated with Altman & Company PC, attorneys for plaintiff Pelican Equity.  On September 18, 2009, I served copies of the attached amended complaint by first class U.S. mail on the following persons:

James Ringer, Esq.
Meister Seelig & Fein LLP
Two Grand Central Tower
140 East 45th Street
19th Floor
New York, New York 10017

Moses Silverman, Esq.
Paul Weiss et al.
1285 Avenue of the Americas
New York, New York 10019

Paul Niehaus, Esq.
Niehaus LLP
1359 Broadway
Suite 2001
New York, New York 10018



Dated: September 18, 2009

ERIC ROSENBERG